596 So.2d 1360 (1992)
STATE of Louisiana
v.
Lorenzo I. JONES.
No. KA 90 2227.
Court of Appeal of Louisiana, First Circuit.
March 6, 1992.
Writ Denied May 15, 1992.
*1362 Jason Lyons, Asst. Dist. Atty., Houma, for plaintiff and appellee State.
Anthony Champagne, Office of Indigent Defender, Houma, for defendant and appellant Lorenzo I. Jones.
Before LOTTINGER, EDWARDS and GONZALES, JJ.
EDWARDS, Judge.
Lorenzo I. Jones, defendant, was charged by bill of information with simple burglary, a violation of LSA-R.S. 14:62. He pled not guilty and was tried by a jury, which convicted him of the responsive offense of attempted simple burglary. The trial court sentenced defendant to imprisonment at hard labor for a term of six years. He has appealed, urging seven assignments of error, as follows:
1. The trial court erred by denying defendant's motion for continuance.
2. The trial court erred by limiting voir dire examination to twenty minutes.
3. The trial court erred by denying defendant's motion for mistrial and discharge of the jury.
4. The jury's verdict was contrary to the law and the evidence.
5. The trial court erred by denying defendant's motion for post-verdict judgment of acquittal.
6. The trial court erred by denying defendant's motion for new trial.
7. The trial court erred by imposing an excessive sentence.
On the night of December 1, 1989, Houma City Police Officer Roland D. Perkins was dispatched to Geri's II Lounge in Houma, Louisiana, in reference to four black males who were burglarizing some vehicles in the parking lot at the lounge. Perkins approached the location in his marked police unit with the unit's lights unilluminated; but, immediately before driving into the parking lot, he turned on the unit's lights.
It was about 8:41 p.m. when Perkins actually pulled into the parking lot and observed four black males in the parking lot. Defendant, whom Perkins recognized, and another of the subjects saw Perkins and started running immediately after Perkins pulled into the parking lot. However, Perkins was able to get close enough to the other two individuals to prevent them from escaping as defendant (and apparently the other subject) had done.
When Perkins exited his police unit, he noticed that three vehicles in the parking *1363 lot had been burglarized. One of these vehicles, a 1981 Ford station wagon, belonging to Melissa Johnson, an employee at Geri's II Lounge, had been ransacked.[1] The door on the passenger side of the 1981 Ford and the glove compartment inside the car were open. Various documents that apparently had been inside the glove compartment were strewn throughout the car. Someone had pulled off the knobs and the face plate of the car's stereo. The knobs and face plate were in the backseat area of the car, and it was apparent that an attempt had been made to remove the stereo from the dashboard. The rearview mirror inside the car had been torn off, and the automatic transmission shift lever had been bent. A bug shield (which had been removed from the front of a truck parked near the 1981 Ford) was found on the parking lot next to an ice chest. The bug shield and the ice chest were about three or four feet from where Perkins had initially observed the four black males.
Perkins' testimony reflects that, at the time he observed the four subjects, there were a few lights in the parking lot. Although the parking lot was "pretty well dark," it was not "totally dark." Nevertheless, Perkins had "no problem at all" seeing the subjects, and he was able to "make a good observation" of them.
Perkins testified that, when he pulled into the parking lot, he did not see defendant inside any of the vehicles in the parking lot nor did he see defendant touch any of the vehicles. Instead, from a distance of about twelve feet, Perkins observed defendant kneeling on the side of the cab of a pickup truck (where Perkins found the ice chest and bug shield) "in a type of way as to be hiding or something like that."[2] The 1981 Ford was to defendant's right, and there was another vehicle between the Ford and the pickup truck. Although Perkins was on the side of the pickup truck opposite where defendant was, Perkins still had a "good view" of defendant. Defendant was facing Perkins, and immediately turned and ran when Perkins pulled into the parking lot. Perkins (who knew defendant prior to the instant incident and was familiar with defendant's physical characteristics, including defendant's height, build and hair) testified that he had "no question" and "no doubt in his mind" as to his identification of defendant.[3]
Melissa Johnson testified that, on the day in question, she drove her car to Geri's II *1364 Lounge, arriving there at about 6:00 p.m. At that time, her stereo was "in fine shape" and "completely installed" into the dashboard; everything else inside the car was in order. She further testified that she had not given anyone permission to remove her stereo.
Larry Anthony White, Jr., a patron at Geri's II Lounge on the night in question, testified that, about fifteen minutes after he arrived at the lounge, he noticed the emergency lights of police cars outside the lounge. He went out to see what was happening and heard the police call out Melissa Johnson's name. At that time, White checked his truck and noticed that the bug shield had been taken off the front of his truck. Earlier, when he arrived at the lounge, he did not notice anyone in the parking lot.
Defendant presented the alibi testimony of Audrey Jones, his mother. She testified that defendant lived with her in Houma during November and December of 1989. According to her, from the latter part of November until Christmas week, and particularly on December 1, 1989, defendant was at work on a shrimp boat in Venice, Louisiana.

ASSIGNMENT OF ERROR NO. ONE:
In this assignment, defendant contends that the trial court erred by denying his motion for a continuance based upon the absence of a witness.
On July 18, 1990, the day of trial, before the first prospective juror was called for examination[4] and out of the presence of the prospective jurors, defense counsel orally moved for a continuance of the trial to allow the defense additional time to continue an investigation for the purpose of finding a "potential alibi witness." In support of his motion, defendant presented the testimony of Robert Brown, an investigator employed by the Public Defender's Office.
Brown testified that he was made aware of the possible alibi witness, Gary Duncans,[5] after an April 26, 1990, pretrial conference. Brown testified that the witness was supposed to have been the captain of a vessel engaged in shrimping/fishing and was supposed to have been defendant's employer.
During his investigation, Brown obtained Mr. Duncans' Venice, Louisiana, telephone number. Brown testified that he called this number on seven occasions. Initially, he spoke to an individual who identified herself as Dana Duncans, Mr. Duncans' daughter. She told Brown that Mr. Duncans was not at home but was expected to arrive from offshore on May 1, 1990. On another occasion when Brown called the telephone number he believed to be that of Mr. Duncans, he again spoke to the person who had identified herself as Dana. She told Brown that Mr. Duncans was inland but that she did not know what time he would be home. Brown testified that, *1365 through the telephone calls he had made, he received information that Mr. Duncans' wife, Faye Duncans, kept employment records for her husband but that it would have been necessary for her to speak to Mr. Duncans since she did not know the whereabouts of all the records. In any event, Brown never spoke to Mr. Duncans on any of the seven occasions he called the number he believed to be that of Mr. Duncans.
Brown indicated that he did not seek the assistance of any local law enforcement agency in attempting to locate Mr. Duncans. Additionally, Brown neither went to Venice to see if he could find Mr. Duncans, nor did he obtain or review any of Mr. Duncans' employment records.
In argument to the trial court, defense counsel acknowledged that, because the defense had not spoken to Mr. Duncans, what Mr. Duncans might say was unknown and that the defense needed to look at Mr. Duncans' records, provided such records existed. Defense counsel also indicated that he did not subpoena Mr. Duncans because he did not have Mr. Duncans' address.
Initially, we note that defendant's oral motion for a continuance presents nothing for review on appeal. State v. Western, 355 So.2d 1314, 1318 (La.1978); State v. Penny, 486 So.2d 879, 887 (La. App. 1st Cir.), writ denied, 489 So.2d 245 (La.1986). Assuming arguendo that he properly presented his contention, we conclude that the court properly denied his motion. Defendant failed to establish any facts and circumstances showing a probability that the witness would be available to testify at some later date. Under these circumstances, we find no abuse of discretion by the trial court in denying the motion for a continuance. See also: State v. Washington, 407 So.2d 1138, 1147-1148 (La.1981); State v. Gordy, 380 So.2d 1347, 1353-1354 (La.1980).
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. TWO:
By means of this assignment, defendant contends that the trial court committed reversible error by limiting voir dire examination of prospective jurors to twenty minutes. He argues that such a limitation frustrates the right to full voir dire examination guaranteed by La.Const. art. 1, § 17. Defendant submits that, "knowing in advance that such a limitation was being set, the entire approach to voir dire had to be changed." Defendant asserts that, as a consequence of the limitation, there would not have been time for any meaningful discussion with any of the prospective jurors; and defendant further asserts that all defense counsel could do was approach voir dire as a brief summarization of the legal principles the defense felt all the jurors should be concerned with and understand.
The record reflects that, (before voir dire examination began) with agreement of counsel and pursuant to the trial court's order, the bailiff drew the names of members of the general venire to comprise two panels of prospective jurors, each consisting of sixteen veniremen. The court indicated to the prosecutor and defense counsel that, in selecting the members of the six-person jury, each side would be allowed six peremptory challenges and one peremptory challenge during selection of an alternate juror.
The record reflects that the trial court announced it was limiting voir dire examination by the state and defendant to twenty minutes each per panel, to which defense counsel objected. Voir dire examination of the first panel of sixteen prospective jurors began with an extensive examination of the veniremen by the trial court. The court's examination included instruction and questioning concerning an accused's presumption of innocence, the state's burden of proof, reasonable doubt, an accused's right not to testify, and the ability of the jurors to accept and follow the law as instructed by the court. The court questioned the prospective jurors to determine if they had: heard or read anything about this case; been the victims of any crimes, particularly automobile burglaries; knew any of the witnesses expected to testify (whom the *1366 court named); previously served on a jury; or were related to the witnesses, the victim or the lawyers. The court also asked the potential jurors if they had any friends or relatives employed by the district attorney's office, the Department of Corrections or any law enforcement agency. In further questioning, the court inquired as to whether or not there was any reason why any of the prospective jurors could not serve as fair and impartial jurors or could not give the state and defendant a fair trial and decide the case solely on the evidence and the law.
After the prosecutor conducted his voir dire examination of the first panel, defense counsel began his examination of the panel. In doing so, defense counsel initially noted that the court had limited counsel to twenty minutes; and, thus, he would "speed up a little bit from what I normally do." Defense counsel then questioned three of the prospective jurors (who had indicated during the court's questioning that they had been victims of burglaries) concerning what, if any, effect the prior experience as a victim might have upon the juror if the juror were selected to serve on the jury. Defense counsel's voir dire then focused on the presumption of innocence, reasonable doubt, the state's burden of proof and defendant's right not to testify. Defense counsel also specifically asked the members of the panel if they would "hold it against" defendant if he chose to exercise his right not to testify, if they had any problem in returning a not guilty verdict if the state failed to prove its case beyond a reasonable doubt, if they had any problems with any of the principles of law he had addressed and if any of them had any problem with sitting on the jury. When defense counsel concluded his examination of this panel, the trial court noted for the record that defense counsel had used ten minutes and fifty-four seconds to conduct his voir dire. In response, defense counsel reurged his objection to the twenty minute limitation.
Voir dire examination of the second and final panel of sixteen jurors proceeded as had the questioning of the first panel, with the court examining the veniremen first, followed by questioning of the prosecutor and then defense counsel. The subject matters covered during these examinations, as well as the scope and duration of the examinations, closely paralleled that of the first panel. In his initial remarks to this panel, defense counsel stated that he would be "pretty brief," explaining that he had already exhausted his six allotted peremptory challenges to exclude six of the prospective jurors on the first panel. Defense counsel indicated that for that reason he was not "going to get into a lot of questioning."
An accused in a criminal case is constitutionally entitled to a full voir dire examination and to the exercise of peremptory challenges. La.Const. art. I, § 17. LSA-C.Cr.P. art. 786 provides that the court, the state, and the defendant shall have the right to examine prospective jurors and that the scope of the examination shall be within the discretion of the court. The purpose of voir dire examination is to determine the qualifications of prospective jurors by testing their competency and impartiality and discovering bases for intelligent exercise of cause and peremptory challenges. State v. Williams, 457 So.2d 610, 613 (La.1984); State v. Burton, 464 So.2d 421, 425 (La.App. 1st Cir.), writ denied, 468 So.2d 570 (La.1985). Because of the difficulty of the concepts and values which must be understood and applied by each juror in his deliberations, counsel for each side is entitled to an opportunity to assess the personality and comprehension of each prospect as a unique human being before accepting him as a juror or challenging him for cause or peremptorily. State v. St. Amant, 413 So.2d 1312, 1319 (La. 1981) (on rehearing). Counsel must be afforded a wide latitude in conducting voir dire examination. State v. Chapman, 410 So.2d 689, 696 (La.1981); State v. Hawkins, 376 So.2d 943, 949 (La.1979) (on rehearing). On the other hand, a trial court has the discretion to limit voir dire examination, *1367 as long as the limitation is not so restrictive as to deprive defense counsel of a reasonable opportunity to probe to determine bases for challenges for cause and for the intelligent exercise of peremptory challenges. State v. Duplessis, 457 So.2d 604, 606 (La.1984). However, in imposing limitations on voir dire examination, a trial court must act with great caution to avoid an abuse of its sound discretion to determine the scope of the examination. See State v. Nix, 327 So.2d 301, 325 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198 (1976); State v. Chapman, 298 So.2d 753, 757 (La.1974). When the accused asserts that he has been deprived of his constitutional right to full voir dire examination, a reviewing court must examine the entire voir dire in order to determine whether or not there has been such a deprivation. State v. Duplessis, 457 So.2d at 606.
We find that an arbitrarily imposed time limitation on a defendant's voir dire examination, such as the twenty minute per panel limitation imposed in this case, is clearly improper and must be avoided by trial courts. A court imposing such an arbitrary limitation flirts with reversible error on grounds of deprivation of a defendant's constitutional right to full voir dire examination.
In the instant case, before the prosecutor and defense counsel questioned each of the panels of prospective jurors, the trial court undertook an exhaustive explanation and inquiry to determine the prospective jurors' qualifications by testing their competency and impartiality. Much of defense counsel's voir dire consisted of inquiries unnecessarily repetitious of those of the trial court. During defense counsel's examination of the first panel, counsel consumed only slightly in excess of half of his allotted twenty minutes; and, in examining the second and final panel of prospective jurors, defense counsel indicated that his questioning would be brief since he had already exercised all of his peremptory challenges. As in the voir dire of the first panel, the record indicates that defense counsel used less than twenty minutes to examine the second panel. The record does not reflect that there was any interruption of defense counsel's voir dire of either panel or that the trial court curtailed any subject matter, explanation or line of inquiry during defense counsel's voir dire. Under these circumstances, although the time limitations imposed were improper, our review of the record of the voir dire examination as a whole convinces us that the potential deprivation of the constitutional right to full voir examination inherent in the time limitations never materialized in this case, in which defendant was afforded full and fair examination of the prospective jurors. Accordingly, because defendant failed to show he was prejudiced by the imposition of the time limitation, this assignment lacks merit.

ASSIGNMENT OF ERROR NO. THREE:
In this assignment, defendant contends that the trial court erred by denying his motion for mistrial and discharge of the jury based on the state's use of peremptory challenges to exclude black prospective jurors, Beverly Thomas, Eloise Harding, and Gloria Jones, from serving on the petit jury, allegedly in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
In Batson v. Kentucky, the United States Supreme Court held that an equal protection violation occurs when the prosecutor, in the trial of a member of a cognizable racial group, exercises peremptory challenges to remove members of the defendant's race from the jury venire for a discriminatory purpose. In Batson, the Supreme Court also set standards for assessing a prima facie case of purposeful discrimination [6] and placed the burden on the prosecution, after such a prima facie showing, *1368 to come forth with a neutral explanation for challenging black jurors that related to the particular case. State v. Collier, 553 So.2d 815, 817 (La.1989).
In order to preserve the complaint that the prosecutor's use of a peremptory challenge was based on racial discrimination, the defense must make a timely objection. LSA-C.Cr.P. art. 841. State v. White, 535 So.2d 929, 934 (La.App. 2nd Cir.1988), writ denied, 537 So.2d 1161 (La. 1989). To be timely, the objection must be made before the entire jury panel is sworn, irrespective of whether or not any alternate juror or jurors are to be selected. State v. Jones, 593 So.2d 1301 (La.App. 1st Cir.1991); State v. Lamark, 584 So.2d 686, 695 (La.App. 1st Cir.), writ denied, 586 So.2d 566 (La.1991).
Herein, the record reflects that defendant initially raised his Batson claim (out of the jurors' presence) after the six-person jury and one alternate juror had been selected and sworn (and prior to the reading of the bill of information and defendant's not guilty plea) by moving for a mistrial and discharge of the petit jury based on the alleged Batson violation. Thus, the motion was untimely.[7] Assuming arguendo that the motion was timely, our review of the voir dire proceeding convinces us that the trial court did not err.
Following defendant's motion, it was stipulated that one of the members of the jury was black. Without the trial court ever ruling on whether or not defendant had made a prima facie showing of intentional discrimination,[8] the prosecutor offered explanations for peremptorily challenging the three prospective black jurors. In doing so, the prosecutor stated that he challenged Gloria Jones because her husband was related to defendant. In regard to the other two black prospective jurors, the prosecutor stated that one of them (to whom he referred as "the lady who was seated right here") was looking up and down and not paying the slightest bit of attention to him, indicating to him that she did not like him, had made up her mind, or was prejudiced in defendant's favor. As to the other black prospective juror he peremptorily challenged, the prosecutor explained that, during his voir dire, she was "playing with her nails and fooling with her purse" and not listening to him, but, on the other hand, she "perk[ed] up" and listened to defense counsel during his voir *1369 dire. Subsequently, the trial court denied defendant's motion on the basis that there was no purposeful discrimination by the state.
In evaluating whether or not an attorney's explanation for exercising peremptory challenges is race-neutral, a court must determine "whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." Hernandez v. New York, ___ U.S. ___, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). The reasons offered to explain the exercise of the peremptory challenges should be deemed race-neutral unless a discriminatory intent is inherent in those reasons. Hernandez v. New York, 111 S.Ct. at 1866.
In this case, the prosecutor's explanations were clearly race-neutral bases for excluding the three black prospective jurors. In rejecting defendant's Batson claim, the trial court chose to believe the prosecutor's race-neutral explanations, a choice entitled to a great deference on appeal. Our review of the entire voir dire proceeding convinces us that the trial court's decision that there was no purposeful discrimination on the basis of race is supported by the record.
This assignment lacks merit.

ASSIGNMENTS OF ERROR NOS. FOUR AND FIVE:
In these assignments, defendant contends that the trial court erred by denying his motion for post-verdict judgment of acquittal. Defendant asserts that the motion should have been granted because the jury's verdict was contrary to the law and the evidence. Defendant submits that Officer Perkins' testimony, coupled with that of Audrey Jones, should make it clear that no rational trier of fact could have found him guilty of any criminal charge.
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged and defendant's identity as the perpetrator of that crime beyond a reasonable doubt. See State v. Moore, 477 So.2d 1231, 1233 (La. App. 1st Cir.1985), writs denied, 480 So.2d 739 and 480 So.2d 741 (La.1986). This standard is codified in LSA-C.Cr.P. art. 821. When circumstantial evidence is used to prove the commission of a crime, LSA-R.S. 15:438 provides that, assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. Ultimately, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Rosiere, 488 So.2d 965, 968 (La.1986).
Simple burglary is defined in LSA-R.S. 14:62, in pertinent part, as follows:
Simple burglary is the unauthorized entering of any dwelling, vehicle, watercraft, or other structure, movable or immovable, with the intent to commit a felony or any theft therein....
An attempt is defined in LSA-R.S. 14:27(A), (B), in pertinent part, as follows:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; ......
Thus, to be found guilty of attempted simple burglary, a defendant must have a specific intent to make an unauthorized entry of "any dwelling, vehicle, watercraft, *1370 or other structure ..." and to commit a felony or any theft therein. LSA-R.S. 14:27 and 62; State v. Walker, 328 So.2d 87, 88 (La.1976); State v. Perkins, 517 So.2d 314, 316 (La.App. 1st Cir. 1987), writ denied, 519 So.2d 141 (La. 1988).
LSA-R.S. 14:10(1) defines specific intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." Specific intent need not be proven as a fact. It may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126, 1127 (La.1982); State v. Moore, 477 So.2d at 1234.
In finding defendant guilty of attempted simple burglary, it is obvious that the jury credited the testimony of the state's witnesses and rejected the alibi testimony of defendant's witness. The credibility of the witnesses' testimony is a matter of weight of the evidence. A determination of the weight to be given evidence is a question of fact, not subject to appellate review. State v. Tate, 506 So.2d 546, 551 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987).
We must look to the inferences made by the trier of fact based on circumstantial evidence and these inferences need only exclude all reasonable hypotheses, not every possible theory, of innocence. State v. Jackson, 419 So.2d 837, 839-840 (La. 1982). Our review of the record convinces us that this standard has been met in this case.
Officer Perkins observed four black males in the parking lot at Geri's II Lounge when he drove into the parking lot after being dispatched to the location in reference to some vehicles that were being burglarized. From a distance of approximately twelve feet, Perkins observed defendant kneeling beside the cab of a pickup truck "in a type of way as to be hiding or something like that." Defendant, who was facing Perkins, immediately turned and ran from the scene with one of the other subjects upon seeing Perkins. Flight and attempt to avoid apprehension, as well as furtive actions, such as an attempt to hide, are indicative of consciousness of guilt and, thus, are circumstances from which a juror may infer guilt. See State v. Moore, 477 So.2d at 1234.
Perkins found the bug shield that had been removed from the front of White's pickup truck and an ice chest on the parking lot where defendant had been kneeling. Perkins had initially observed all four of the black males about three or four feet from these same items. Johnson's ransacked vehicle was to the right of where defendant had been kneeling, and there was only one other vehicle between White's and Johnson's vehicles. In addition to the damage that had been done to Johnson's car, the knobs and face plate from the car's stereo had been removed in an apparent attempt to take the stereo out of the car. Johnson had not given anyone permission to remove the stereo. When she parked her car at the lounge earlier that day, the stereo was "in fine shape" and "completely installed" and everything else in the car was in order.
White arrived at the lounge approximately fifteen minutes before he noticed the police outside the lounge investigating the instant offense. Upon his arrival, he had not seen anyone in the parking lot.
Although Perkins described the parking lot as "pretty well dark," he made clear that it was not "totally dark" and that he had "no problem at all" seeing the subjects and was able to "make a good observation" of them. More particularly, in reference to his identification of defendant, Perkins stated that he had a "good view" of defendant. Perkins knew defendant prior to the instant offense, and he was familiar with defendant's physical characteristics; and, in making his identification of defendant, Perkins maintained that he had no doubt of defendant's identity.
Viewing the evidence, both direct and circumstantial, in the light most favorable *1371 to the prosecution, we find that any rational trier of fact could have found that the state proved the elements of attempted simple burglary beyond any reasonable doubt, to the exclusion of every reasonable hypothesis of innocence. Thus, the trial court properly denied defendant's motion for post-verdict judgment of acquittal.
These assignments lack merit.

ASSIGNMENT OF ERROR NO. SIX:
By means of this assignment, defendant contends that the trial court erred by denying his motion for new trial. Defendant's only argument in support of this assignment is that he is entitled to a new trial on the basis of the allegations made in his assignments of error numbers one, two and three. However, because we found no merit to the allegations in those assignments, this assignment is also meritless.

ASSIGNMENT OF ERROR NO. SEVEN:
In this assignment, defendant contends that his sentence is excessive.
La.Const. art. I, § 20, prohibits the imposition of excessive punishment. Excessiveness of a sentence is a question of law which is reviewable. See State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. State v. Hawkins, 496 So.2d 643, 649 (La.App. 1st Cir.1986), writ denied, 500 So.2d 420 (La.1987). In other words, a sentence may be both within the statutory limits and constitutionally excessive. State v. Sepulvado, 367 So.2d at 767. A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. To determine whether or not a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether or not the penalty is so disproportionate as to shock our sense of justice. State v. Bonanno, 384 So.2d 355, 358 (La.1980). Maximum sentences are imposed for the most serious violations of the described offense and for the worst kind of offender. State v. Tate, 506 So.2d at 552; State v. Leason, 477 So.2d 771, 779 (La. App. 1st Cir.1985). Because of the wide discretion afforded the trial court in imposing sentence, a sentence within statutory limits will not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Payne, 540 So.2d 520, 524 (La.App. 1st Cir.), writ denied, 546 So.2d 169 (La.1989).
A trial court's reasons in imposing sentence, as required by LSA-C.Cr.P. art. 894.1, are an important aide to this Court when reviewing a sentence alleged to be excessive. State v. Hicks, 554 So.2d 1298, 1305 (La.App. 1st Cir.1989), writ denied, 559 So.2d 1374 (La.1990). The trial court need not recite the entire checklist found in LSA-C.Cr.P. art. 894.1. However, the record must reflect that the court adequately considered the guidelines. State v. Davis, 448 So.2d 645, 653 (La.1984). Even when the trial court has not complied with LSA-C.Cr.P. art. 894.1, this Court need not remand the case for resentencing unless the sentence imposed is apparently severe in relation to the particular offender or the offense committed. State v. Carr, 530 So.2d 579, 592 (La.App. 1st Cir.), writ denied, 533 So.2d 354 (La.1988), cert. denied, 489 U.S. 1098, 109 S.Ct. 1573, 103 L.Ed.2d 939 (1989).
Attempted simple burglary is punishable by a fine not to exceed one thousand dollars, imprisonment with or without hard labor for not more than six years, or both. LSA-R.S. 14:27(D)(3) and 14:62. Herein, defendant was sentenced to the maximum term of six years imprisonment at hard labor and no fine was imposed.
At sentencing, the trial court noted that it had been less than a year since defendant had entered an April 16, 1990, guilty plea to possession of cocaine. The court *1372 noted that that felony conviction was preceded by defendant's guilty plea to misdemeanor theft.
In imposing the instant sentence, the trial court stated: "Okay, Mr. Jones, when I sentenced you to that first misdemeanor theft, I gave you a break, and whoever sentenced you, and I see it is Division "E," Judge Wimbish sentenced you to possession of cocaine also gave you a break. Your breaks are over with now." The court additionally stated that it felt there was an undue risk that defendant would commit another crime during any suspended sentence or probation, that defendant was in need of correctional treatment in a custodial environment that can be provided most effectively by his commitment to an institution, and that a lesser sentence would deprecate the seriousness of defendant's crime.
We find that the sentence imposed on defendant is neither apparently severe in relation to defendant, a second felony offender, nor to the offense he committed. Thus, we find no abuse of discretion by the imposition of the maximum sentence for this attempted simple burglary.
This assignment lacks merit.
CONVICTION AND SENTENCE AFFIRMED.
LOTTINGER, J., concurs.
NOTES
[1] The instant bill of information charged defendant only with simple burglary of Johnson's 1981 Ford.
[2] Perkins testified, on cross-examination, that, although it was possible that defendant was tying his shoe laces, he "really [could not] say that."
[3] During his direct examination, Perkins stated that he recognized defendant and had "no question" that it was defendant. In brief, defendant attempts to lessen the degree of certitude of Perkins' identification of defendant by attempting to paraphrase certain testimony elicited during Perkins' cross-examination. That testimony given on cross-examination is included in the following exchange:

Q. Now, officer, when you got close enough to actually look at a face, this person already had his back to you, right?
A. Yes.
Q. Remember, you are under oath. Okay?
A. Yes.
Q. Is it correct, that you cannot be positive that it was Lorenzo Jones by what you saw on the scene?
A. From what I saw on the scene, from my perception, I would say it was Lorenzo Jones.
Q. But you cannot tell us that you saw his face well enough to be positive that that was the face of Lorenzo Jones, can you?
A. II can't say that I looked directly straight into his eyes, no, at the time I pulled up.
Q. So, is it a correct statement that from your view of that man's face, you cannot be positive that that was the face of Lorenzo Jones? Is that a correct statement?
A. Well, I don't know what you want me to sayFrom my point of view, from what I saw, I would say it was Lorenzo Jones.
Q. But that is not from seeing his face; from what you saw of his face, you could not be positive that that was the face of Lorenzo Jones, can you officer?
BY MR. LYONS:
Judge, I am going to object. He has asked it 3 times and he has answered it 3 times.
BY THE COURT:
Well, I am going to overrule the objection at this point. [T]here may be a distinction between the man's face, as compared to the man's hair, compared to the man's body, style of walking or whatever. So, I don't think he has actually answered the question, specifically. So, ask it one more time.
Q. I am enclosing what I perceive to be my face with my hands, okay?
A. Yes, sir.
Q. From that portion of the body of the man that you saw, is it correct that you did not composite (sic) that it was Lorenzo Jones?
A. No, sir.
Q. So, my statement is a correct statement?
A. Somewhat, yes, somewhat.
Thereafter, on redirect examination, in reiterating the positive nature of his identification of defendant, Perkins testified that, on December 1, 1989, he was familiar with defendant and defendant's physical characteristics, including his height, build and hair. Perkins further testified on redirect examination that, when he pulled into the parking lot and observed defendant about twelve feet away, there was nothing to obstruct his vision of defendant and that he had "no doubt" in his mind that the individual he saw was defendant.
[4] Because the motion was made before the first prospective juror was called for examination, the trial had not commenced. See LSA-C.Cr.P. art. 761. Thus, the motion was properly denominated a motion for continuance rather than a motion for recess. See LSA-C.Cr.P. art. 708.
[5] In brief, defense counsel indicates that the witness' surname is "Durkins." However, in his testimony, Robert Brown indicated that the witness' surname is "Duncans" rather than "Durkins."
[6] We note that in Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), a case involving a white defendant, the United States Supreme Court held that the Equal Protection clause prohibits a prosecutor from using peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race, "a practice that forecloses a significant opportunity to participate in civic life." The Supreme Court further held that, while an individual juror does not have the right to sit on a particular petit jury, the juror possesses the right not to be excluded from serving on one on account of race; and the Supreme Court concluded that any defendant, regardless of his race, may raise the third-party equal protection claims of jurors excluded by the prosecution because of their race.

Under Batson v. Kentucky, which involved a black defendant, the United States Supreme Court set forth the procedure for the establishment of a prima facie case of purposeful discrimination. Under this procedure, a defendant first had to show that he was a member of a cognizable racial group and that the prosecutor had exercised peremptory challenges to remove from the venire members of the defendant's race. Clearly, this initial showing is obviated by the holding in Powers v. Ohio. State v. Lamark, 584 So.2d 686, 695 n. 1 (La.App. 1st Cir.), writ denied, 586 So.2d 566 (La.1991).
[7] We note that the provisions of LSA-C.Cr.P. art. 790 (as amended by Act 524 of 1990), providing for the swearing of jurors when the selection of jurors and alternate jurors has been completed and all issues properly raised under art. 795 have been resolved, and the provisions of LSA-C.Cr.P. art. 795 (as amended by Act 713 of 1990), requiring that peremptory challenges be exercised prior to swearing of the jury panel and providing procedures for disposal of objections alleging systematic exclusion of prospective jurors by the state on the basis of race, were not in effect at the time of defendant's trial.
[8] Once a prosecutor has offered a race-neutral explanation for his peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether or not a prima facie case has been made becomes moot. Hernandez v. New York, ___ U.S. ___, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).